## Scott v. Roberts.

(Decided Oct. 2, 1936.)

C. B. WHEELER and S. C. FERGUSON for appellant.

HILL & HOBSON for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

These parties were rival candidates for the office of magistrate in district 4 of Floyd county at the general election held November 5, 1935. There are nine voting precincts in the district, and the vote as counted was:

| Precinct | Roberts | Scott |
|---|---|---|
| Johns Creek, No. 8 | 95 | 155 |
| Mouth of Mud, No. 14 | 168 | 164 |
| Little Mud, No. 15 | 95 | 116 |
| Tickey, No. 16 | 70 | 204 |
| Betsy Layne, No. 17 | 344 | 201 |
| Antioch, No. 18 | 146 | 130 |
| Toler, No. 31 | 116 | 160 |
| Ivel, No. 34 | 121 | 119 |
| Lee Alley, No. 44 | 24 | 150 |
| | 1,169 | 1,399 |

Roberts filed a contest in which he charged Scott had violated the Corrupt Practice Act (Ky. Stats., sec. 1565b-1 et seq.); alleged that 76 electors had illegally voted for Scott; and alleged irregularities in Tickey, No. 16, and Lee Alley, No. 44, because of which he sought to have those entire precincts thrown out.

Scott in his answer sought to have 40 alleged illegal votes deducted from the vote for Roberts.

The court found Scott had violated the Corrupt

Practice Act and hence was not entitled to the certificate of election, and that there was such fraud, bribery, and corruption in the election that it was impossible to tell who was elected; hence he held the office of magistrate in this district was vacant because there had been no election. See section 1596a-12, Ky. Stats. Supp. 1933.

Scott had a supersedeas served on Roberts and appealed, and Roberts has prosecuted a cross-appeal. It must be shown in this record the above judgment is wrong if either hopes to succeed.

### Violation of Corrupt Practice Act.

The record contains evidence of the purchase of six votes by Scott himself. Of course, he denies this, but the established purchase of one vote by him would be fatal to his hopes, and in view of the evidence of these six different witnesses, who testify he bought their votes, we cannot say the trial court erred in finding against Mr. Scott.

### Bribery and Corruption.

These litigants are not novices. They had a contest over an election in this same district and for this same office in November, 1933. See 255 Ky. 34, 72 S. W. (2d) 728. Their experience then seems not to have resulted in any less bribery, corruption, etc., this time, but did result in certain refinements in the mode of operations. They became more subtle. The results are the same, but the means by which they were accomplished are less open than before. For example, one of the "strikers" (as the vote buyers are called by the witnesses) by whom voters were struck for the purchase of their vote, and who admitted he was buying votes for the Republican ticket, when asked where he got the $75 or $100 he used answered:

> "I got it on Sunday night; some one came and called me out and gave me an envelope and told me here was the Republican money for the Little Mud Precinct and it was written on the envelope 'for Little Mud Precinct' and I broke it open and never counted the money."

> "Q. 12. Did you know the person who gave you that money? A. No, sir; I didn't."

> "Q. 15. What did you do with that money? A. He told me it was Republican money and I went

to Little Mud with it and done the best I could for the Republican ticket.''

''Q. 17. How much did you pay a vote? A. Well, I paid three dollars for some; two dollars for some.''

''Q. 47. Did you see John Scott on the occasion when you received the envelope with the money in it? A. No, sir.''

Another striker testified in this fashion:

''Q. 7. Where did you get that money? A. I got that money at Harold.

''Q. 8. When? A. I got it the evening before the election.''

''Q. 11. Was it in the daytime? A. No, sir.

''Q. 12. Did some person deliver it to you? A. Yes, sir.

''Q. 13. What was his name? A. I don't know his name; I even don't know whether it was a man or woman.

''Q. 14. Was it handed to you from a place in which the party was concealed? A. Well, it was dark and I didn't have any conversation with the party and he passed it to me.''

''Q. 23. Did you talk any with this person who gave you the money? A. I did not.

''Q. 24. How come you to know that this party intended to give you some money? A. I didn't know they intended to till they just said 'here' and reached it to me and I put it in my pocket.''

''Q. 32. About how many votes did you buy on the day of the election? * * * A. I don't think that I bought more than half a dozen votes, myself.''

''Q. 38. About what percentage, in your opinion, of the voters of that precinct sold their votes up there that day? A. It depends on how many the Democrats bought. I don't know. There was a right smart percent provided Bev done any good.''

Another one of the constables of the county gave this account:

''I was coming up the street out yonder near that church house [pointing toward the Baptist

Church on Court Street] and I met two fellows and one of them called me in there and gave me two envelopes and said, 'One of these is Antioch funds and the other is Tickey.' "

"Q. 13. What day was that? A. That was Saturday night before the election."

"Q. 29. Did you ever see these men before, that gave you the money? A. I might have, I don't know; they was only one of them."

"Q. 32. Have you ever seen them since? A. I could have; if I have, I wouldn't have knowed him."

The Democrats were not less active, and this is taken from the testimony of one of their strikers:

"Q. 375. What time did you go to Ivel precinct? A. I got there about daylight."

"Q. 378. What did you go there for? A. I went to get what votes I could for the Democrat ticket.

"Q. 379. Did you have any money to use in making the fight? * * *

"Q. 382. How much money had you? A. I never counted it.

"Q. 383. How large a bulk did you have? A. Well I imagine something like a hundred dollars would be my guess about it.

"Q. 384. What was the denomination of the bills? A. Ones."

"Q. 386. Did you spend the money? A. I spent part of it.

"Q. 387. In what way? A. I bought votes for the Democrat ticket.

"Q. 388. Do you remember how much you paid for each vote? A. What votes that I remember about I chipped in a dollar a vote for the Democrat ticket with some of the boys in the school race who paid a dollar, paid $2.00 a vote."

"Q. 397. Where did you get the money that you used there? A. I got it of Jerry Boyd.

"Q. 398. He is a father-in-law of Dewey Roberts? A. Yes, sir."

"Q. 426. How come you to go to Jerry Boyd's to get money? A. Well, the day that Chandler spoke down here, Jerry Boyd come to me out there in the courthouse yard and told me had got some money out of the bank and was going to take it home with him but he didn't want Dewey Roberts to know nothing about it and said he wanted me to know about it and at any time that I needed it to come and get it. Two or three days before the election I went up there and told him I wanted that money. He got it and gave it to me."

This is the testimony of another Democrat:

"Q. 4. Where were you on election day? A. I was at Little Mud Precinct."

"Q. 10. Did you have any money there that day? A. Yes sir.

"Q. 11. How much? A. I don't know the exact amount, never counted it.

"Q. 12. Did you tell Frank Kidd you had $175.00 there? A. I don't remember.

"Q. 13. Did you give Frank Kidd any money? A. Yes, sir.

"Q. 14. How much? A. $30.00.

"Q. 15. What was he to do with it? A. He was to buy for the straight ticket."

"Q. 18. What else did you do with the money you had besides what you gave to Kidd? A. I gave it to the voters.

"Q. 19. What for? A. For votes."

"Q. 21. How much did you give each voter? A. About $3.00."

"Q. Did you use all the money you had? A. I sure did.

"Q. 32. Did you pay everybody $3.00 each? A. No, sir.

"Q. 33. Tell about how the prices run? A. $3.00 down to $2.00."

There were nine vote buyers operating in this district who testify they were doing so and who admit using over $700 in buying votes. There were several others who refused to answer when asked about vote

buying. Even one of the election officers testified $30 was given him, but apparently he got nervous and gave it back. Voters were being buttonholed and privately consulted continuously, and the activity about these polling places can be well likened to that about an ant-hill.

We have found no evidence so directly connecting either Scott or Roberts with this as to make the corrupt practice act apply to them, but the corruption of the electorate resulted just the same.

### Abstracted Ballots.

At Ivel precinct, when the polls were opened, it was found some one had torn out ballot No. 10 and had written on the stub the name of Booker Justice, ballot No. 15 was gone and a stub made out in the name of S. Maston, and so on throughout the book about every fourth or fifth ballot was taken out and the name of some one written on the stub. In this way 41 ballots had been taken out.

The box was thereupon carefully examined and these ballots were not in there. How they finally got in there this record does not disclose, but when the ballots were counted by the commissioners they tallied with the stubs. There is no evidence to show who tore out these ballots, but this book, the night before, was in the hands of the friends of Roberts.

### Other Corruption.

There was evidence of chain voting, table voting, voting by infants, nonresidents, of ballots being premarked, and other irregularities. No one after the most careful scrutiny and recasting can really know with any degree of accuracy just what was the true result of this so-called election; hence we cannot say the chancellor erred in declaring there had been no election. Therefore the judgment is affirmed upon both the original appeal and the cross-appeal.